# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 10, 2013                    Decided July 12, 2013

No. 12-1335

HELICOPTER ASSOCIATION INTERNATIONAL, INC.,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

On Petition for Review of an Order of
the Federal Aviation Administration

*J. Michael Klise* argued the cause for petitioner. With him on the briefs were *D. Kirk Shaffer* and *Gerald F. Murphy*.

*Edward Himmelfarb*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, and *Michael J. Singer*, Attorney.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Helicopter Association International, Inc. ("HAI"), challenges the authority of the

Federal Aviation Administration ("FAA") to issue a rule requiring helicopter pilots to use a route one mile off the north shore of Long Island, New York for the purpose of noise abatement in residential areas. Because this challenge fails, and because HAI's other contentions regarding the lack of substantial evidence, deviation from FAA policy, and a flawed Regulatory Flexibility Act certification are unpersuasive, we deny the petition for review.

**I.**

Prior to 2008, helicopter pilots flying between New York City and eastern Long Island typically chose between three routes: (1) the northern coast of Long Island; (2) the Long Island Expressway through the middle of the island; or (3) the southern coast of Long Island. Many pilots preferred to travel the north shore route when traveling to south shore destinations like the Hamptons, because that route was faster and less likely to encounter weather delays common along the south shore. As a result, the north shore route experienced significant helicopter traffic. In response to complaints about the helicopter noise, the FAA developed the North Shore Helicopter Route, which it added to the New York Helicopter Route Chart in 2008. This route, which was voluntary, diverted helicopter traffic from populated areas on the north shore of Long Island to the waters of Long Island Sound.

When elected officials and FAA's Flight Standards District Office continued to receive complaints about helicopter noise on the north shore, the FAA in 2010 proposed to make the North Shore Route mandatory. *See Notice of Proposed Rulemaking*, 75 Fed. Reg. 29,471, 29,472 (May 26, 2010) ("NPRM"). Upon receiving approximately 900 comments — from residents, local government, citizen groups, businesses, and various trade associations — the FAA determined that "[s]lightly more than

a third of the total number of commenters complained about the levels of helicopter noise that they are exposed to, particularly during the summer months," and issued the final rule in 2012. *The New York North Shore Helicopter Route*, 77 Fed. Reg. 39,911, 39,913 (July 6, 2012) ("*Final Rule*").

The FAA found that "residents along the north shore of Long Island emphatically agreed that helicopter overflights during the summer months are unbearable and negatively impact their quality of life." *Id*. at 39,913. Assisted by the John A. Volpe National Transportation Systems Center in analyzing data from the Performance Data Analysis and Reporting System ("PDARS"), the FAA "modeled noise from approximately 15,600 flight operations, based on an average of 42.8 operations per day over 11 days around Memorial Day and July 4, 2011," two of the busiest helicopter traffic weekends of the year. *Id*. at 39,914, 39,916 n.7. This data was used to calculate north shore day-night average sound levels ("DNLs"), which consist of "the 24-hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels for the periods between midnight and 7 a.m., and between 10 p.m., and midnight, local time." 14 C.F.R. § 150.7. The FAA found that the sound levels, which were below DNL 45 dB, were "below levels at which homes are significantly impacted." *Final Rule*, 77 Fed. Reg. at 39,916.

In promulgating the Final Rule, the FAA did not change the existing route that had been in use for several years but explained that "[m]aximizing the utilization of the existing route by making it mandatory will secure and improve upon the decreased levels of noise that have been voluntarily achieved." *Final Rule*, 77 Fed. Reg. at 39,914. Because "safety is [the FAA's] highest priority," *id*., exceptions were provided for helicopters not adequately outfitted to travel the route safely and for pilots who determine route deviation is required because of

weather or a need to transition to or from a destination or point of landing. *Id*. at 39,914–15. The rule will be provisional for two years, after which the FAA will sunset it upon determining "there is no meaningful improvement in the effects of helicopter noise on quality of life or that the rule is otherwise unjustified." *Id*. at 39,918. If there is improvement, the FAA may make the rule permanent "after appropriate notice and opportunity for comment." *Id*. Or, if "reasonable modifications [can] be made to the route to better address noise concerns . . . [, the FAA] may choose to modify the rule after notice and comment." *Id*. Pursuant to the Regulatory Flexibility Act, 5 U.S.C. § 605, the FAA certified that because the Final Rule would impose minimal costs on regulated small entities, a regulatory flexibility analysis was not required. *Final Rule*, 77 Fed. Reg. at 39,919–20. HAI petitions for review.

## II.

HAI challenges the Final Rule on four grounds, contending first that the FAA lacks authority to alter air traffic patterns for the sole purpose of reducing the impact of aircraft noise on residential communities. As authority for the rule, the FAA relied on 49 U.S.C. § 40103 and § 44715. Section 40103(b) addresses "the use of the navigable airspace" and provides in subsection (b)(2) that "[t]he Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for . . . protecting individuals and property on the ground." Section 44715 authorizes the FAA to set standards to measure aircraft noise and to prescribe regulations to control and abate aircraft noise. 49 U.S.C. § 44715(a)(1)(A) (i) & (ii).

In HAI's view, Congress has established a relatively narrow framework under which the FAA can regulate noise. HAI maintains that the FAA's general authority under § 40103 is limited by its focus on safety in subsection (b)(1), and by

other provisions that address the FAA's authority to regulate noise through technology certification, *see id.* § 44715(a)(1), and in and around airports, *see id.* §§ 47501 *et seq.*, §§ 47521 *et seq.* Viewing these provisions together, HAI concludes that the FAA cannot escape the limits on its jurisdiction to regulate noise by relying on its general authority in § 40103.

In support of its position, HAI relies on *American Petroleum Institute v. EPA*, 52 F.3d 1113 (D.C. Cir. 1995), where the court, upon reviewing a rule on a renewable oxygenate requirement, held the agency could not "rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of [the agency] in a particular area." *Id.* at 1119. In that case, Congress set a specific objective of reducing emissions of ozone-forming volatile organic compounds (VOCs). *See id.* at 1115. Relying on its general rulemaking authority, 42 U.S.C. § 7601(a)(1), the agency ignored this objective, favoring instead a renewable oxygenate that would not reduce VOC emission levels. *Id.* at 1115–16. HAI maintains that the FAA's reliance on its general authority under § 40103 is similar to the EPA's reliance on its general rulemaking authority under 42 U.S.C. § 7601(a)(1) and is likewise impermissible.

Whether the FAA has exceeded congressional limits on its authority is a question of statutory construction to which the familiar two step analysis in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), applies. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*Id*. at 843. Such deference by the court extends to the agency's interpretation of statutory ambiguity that concerns the scope of the agency's jurisdiction. *See City of Arlington, Texas v. FCC*, – U.S. –, 133 S. Ct. 1863 (2013).

Under the plain text of § 40103, the FAA has authority to "prescribe air traffic regulations . . . [to] protect[] individuals and property on the ground." 49 U.S.C. § 40103(b)(2). This is exactly what the FAA did here. Responding to the noise complaints of Long Island residents, the FAA prescribed new air traffic regulations with the purpose of protecting these residents' use and enjoyment of their property. Noise, when it reaches certain levels, has long been considered an actionable nuisance because of its impediment to the use and enjoyment of property. *See, e.g.*, 3 THOMAS M. COOLEY & D. AVERY HAGGARD, A TREATISE ON THE LAW OF TORTS § 430 (4th ed. 1932). The word "protect," defined as "to cover or shield from that which would injure, destroy, or detrimentally affect," WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1822 (1981), is broad enough to encompass protection from noise caused by aircraft, and Congress would, absent indication to the contrary, have intended that the word be read in accordance with its natural meaning, *see Regents of the Univ. of Cal. v. Pub. Emplymt. Relations Bd.*, 485 U.S. 589, 595 (1988).

HAI has pointed to no express limitations on the FAA's general authority to protect individuals on the ground from aircraft, including the noise created by their operation. Although the noise-related provisions HAI cites refer to discrete areas, for example, to noise reduction in or near airports, *see, e.g.*, 49 U.S.C. §§ 47521 *et seq*., or to technology certification, *see id*. § 44715(a)(2), neither their substance (as interpreted by HAI) nor their structure suggest that Congress intended to narrow its broad authorization to the FAA to regulate the use of

navigable airspace, much less to restrict the FAA's capacity to manage aircraft noise to these limited contexts. As regards the safety limitation emphasized by HAI, neither § 40103 when read as a whole nor the plain text of § 40103(b)(2) requires that air safety be the primary goal of all FAA regulations. The "Federal Aviation Act requires a delicate balance between safety and efficiency and the protection of persons on the ground." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638–39 (1973) (citation omitted); *see BFI Waste Sys. of N. Amer., Inc., v. FAA*, 293 F.3d 527, 533 (D.C. Cir. 2002). So long as the FAA *balances* safety concerns appropriately, as it did here, its rulemaking decisions will not conflict with other statutory safety requirements.

HAI does not dispute that reducing noise through altering flight routes can protect property on the ground by preventing "interference with the interest in the private use and enjoyment of the land." *Souders v. Wash. Metro. Area Transit Auth.*, 48 F.3d 546, 551 (D.C. Cir. 1995) (internal alteration and quotation marks omitted). Yet its view of Congress's legislative scheme would eviscerate such protection, preventing the FAA from altering flight plans even where numerous helicopters were operating at low altitudes over residential areas at all hours of the day and night. HAI offers no persuasive reason to attribute such a counterintuitive intent to Congress's broad authorization to the FAA over the flight of aircraft to protect individuals and property. HAI's counsel's suggestion during oral argument that the FAA can address helicopter noise only by imposing certification restrictions on noise-producing aircraft technologies, such as engines, *see* Oral Arg. Tr. at 6–7; *cf.* 49 U.S.C. § 44715(a)(2), conflicts with § 40103(b)(2)'s plain text. *Dictum* to the contrary regarding the scope of § 40103's predecessor in *DiPerri v. FAA*, 671 F.2d 54, 57 (1st Cir. 1982), is unpersuasive in view of the plain text of § 40103(b)(2) and the inconclusive legislative history on which the court relied.

8

*Id*. (interpreting 49 U.S.C. § 1348(c) and citing H.R. REP. NO. 85-2360 (1958)).

The interpretation of § 40103(b)(2) as encompassing protection from aircraft noise reflects the FAA's long held understanding of its authority. *See, e.g.*, *Special Air Traffic Rules and Airport Traffic Patterns, Lorain County Regional Airport, Ohio*, 33 Fed. Reg. 11,748, 11,749 (1968). Even assuming that because § 40103(b)(2) does not expressly state that "protect" includes protection from aircraft noise and thus is silent on the precise question at issue, *see Chevron*, 467 U.S. at 843, the FAA's interpretation is reasonable and consistent with the other statutory provisions cited by HAI, which indicate that Congress intended to address aircraft noise in several different ways, not to limit the broad authority granted under § 40103(b)(2). HAI fails to show that the FAA's interpretation of its authority is impermissible, much less that the affirmative grant of authority to regulate "the use of the navigable airspace . . . for . . . protecting individuals and property on the ground" in § 40103(b) is comparable to the broad, non-substantive rulemaking authority on which the EPA relied in the face of an express congressional limitation in *American Petroleum*, 52 F.3d at 1117. The situation in *American Petroleum*, where an agency flouted a congressionally imposed restriction, is not present here. HAI's reliance on *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000), for the proposition that Congress's more specific enactment controls a prior grant of general authority is likewise misplaced.

Because we conclude that the FAA acted within its authority under § 40103(b)(2) in promulgating the Final Rule, we need not address whether § 44715 could serve as an independent source of such authority.

### III.

We turn to HAI's contentions that the FAA's finding that there is a noise problem is unsupported by substantial evidence in the record and that the Final Rule was an impermissible deviation from longstanding FAA policy. Under the Administrative Procedure Act, the court will "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary [and] capricious." 5 U.S.C. § 706(2) & (2)(A). Again, our standard of review is highly deferential. *See City of South Bend, Ind. v. Surface Transp. Bd.*, 566 F.3d 1166, 1169 (D.C. Cir. 2009). The FAA's findings of fact are "conclusive" if they are "supported by substantial evidence." 49 U.S.C. § 46110(c). HAI has failed to demonstrate that the Final Rule is unlawful and must be set aside. And although the FAA acknowledges, as HAI points out, that its certification under the Regulatory Flexibility Act was based on incorrect fuel cost data, there is no uncertainty that the FAA would reach the same result in assessing the impact of the Final Rule on small entities were the court to remand.

### A.
According to HAI, public complaints about noise are not evidence of a noise problem absent objective, corroborating data and the FAA's justification for the Final Rule is without foundation. It relies on S*afe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007), where the FAA based its decision to evaluate differently two types of runway light bases on the unsubstantiated statement of a single employee who had responded to industry comments on a proposed FAA Advisory Circular. In that case, the court held that "one employee's bare assertions" did not amount to substantial evidence. *Id.* at 595.

In promulgating the Final Rule, the FAA relied on a host of externally generated complaints from elected officials and

commercial and private residents of Long Island. It found that over one third of commenters complained of helicopter noise. *Final Rule*, 77 Fed. Reg. at 39,913. The FAA explicitly referred in the preamble to the Final Rule to the commenters' complaints that "the helicopter noise interferes with sleep, conversation, and outdoor activities." *Id*. HAI offers no evidence that the complaints were not based on actual experience or were otherwise falsified. Although HAI refers to the comment by the Eastern Region Helicopter Council ("Council") that 85% of the complaints to its hotline came from only ten individuals, the FAA pointed out that this "cannot demonstrate these individuals are the only ones disturbed by the existing noise levels." *Id.* at 39,914. The hundreds of complaints considered by the FAA in response to the NPRM were identifiable by the commenter's name and a date. The FAA could reasonably accept these comments from individual members of the public, which are different from the unsubstantiated factual statement of the agency employee in *Safe Extensions*, 509 F.3d at 595, as empirical data of a noise problem. HAI overlooks, moreover, that an agency's conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view. *See Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994).

HAI claims, however, that the FAA acknowledged the existence of scientific evidence that demonstrates there is no significant noise problem, thereby undermining the reliability of the complaints and by extension its decision to act on those complaints. The Volpe study commissioned by the FAA revealed that DNLs on and around the two busiest helicopter traffic weekends of the year (Memorial Day and Fourth of July weekends) were less than 45 dB along the north shore of Long Island, *see Final Rule*, 77 Fed. Reg. at 39,916 & n.7, well below the DNL 65 dB ceiling set by the FAA to mark noise levels

compatible with residential land use near airports. *See* 14 C.F.R. pt. 150, app. A, tbl. 1. According to HAI, this reveals that the FAA's own study shows that the basis of the rule, a noise problem, did not exist.

HAI has not identified any statutory or regulatory provision that sets 65 dB as the minimum noise level that must be reached before the FAA can regulate the impact of aircraft noise on residential populations. Neither has it shown that the area addressed in the Final Rule is near an airport. The FAA's Airport Noise Compatibility Program, where the 65 dB level appears, states that "[t]he designations contained in this table do not constitute a Federal determination that any use of land covered by the program is acceptable or unacceptable under Federal, State, or local law." 14 C.F.R. pt. 150, app. A, tbl. 1 n.*. That level was established for use in mapping noise exposure within the vicinity of airports, not residential areas far removed from an airport environment. *See id.*, app. A, pt. A § A150.1(a). It serves as a reference point from which the FAA can reasonably deviate when determining whether a particular noise reduction intervention is in the public interest. *See Environmental Impacts: Policies and Procedures*, 69 Fed. Reg. 33,778, 33,780–81 (June 16, 2004). Here, based on its evaluation of the complaints and the results of the Volpe study, the FAA concluded that noise levels below DNL 45 dB were adversely impacting the north shore's residential population to a degree that further control was warranted, at least on a provisional basis. The FAA explained that maximizing the use of the existing North Shore Route would "secure and improve upon the decreased levels of noise that have been voluntarily achieved." *Final Rule*, 77 Fed. Reg. at 39,914.

Furthermore, the FAA's stated objective in making the North Shore Route mandatory was not limited to "improv[ing] upon the decreased levels of noise that have been voluntarily

achieved," but to "secur[ing]" the existing noise levels as well by preventing future increases. *Id.* Even assuming voluntary usage of the route was high and noise levels relatively low, *see Final Rule*, 77 Fed. Reg. at 39,914, 39,916, the rule was designed to ensure that use of the route continues and that the noise levels do not increase, thereby aggravating the problem identified by commenters, *id.* at 39,914. Given the provisional nature of the Final Rule, it represents a relatively minor, temporary adjustment to the existing route that HAI maintains is used by most helicopters. HAI fails to show the FAA acted unreasonably.

To the extent HAI maintains the FAA relied on faulty evidence and methods because it failed to use a larger data set and a particular data analysis method, i.e., the Integrated Noise Model, HAI ventures unsuccessfully into areas of agency expertise. *See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1008 (D.C. Cir. 2002). HAI cites no authority for the assertion that the FAA is required to use the Integrated Noise Model when assessing noise levels outside the vicinity of airports. The FAA has identified the Integrated Noise Model as appropriate for assessing noise in and around airports and the Noise Integrated Routing System model ("NIRS") for use "where the study area is larger than the immediate vicinity of an airport." FAA Order 1050.1E, *Environmental Impacts: Policies and Procedures*, app. A, ¶ 14.5e (Mar. 20, 2006). The North Shore Route begins approximately 20 miles northeast of LaGuardia Airport, suggesting the FAA appropriately could use the NIRS, or, as it did in this instance, a successor to the NIRS model. *Final Rule*, 77 Fed. Reg. at 39,913. Moreover, HAI's counsel conceded at oral argument that "we don't really have a complaint about the [Volpe] study, we have a complaint that the FAA in imposing this rule is ignoring this study." Oral Arg. Tr. at 16. But, as noted, the FAA's decision to make the route mandatory was based on its assessment of the numerous complaints it received,

not on the study *per se*.  HAI has not met its burden to show that the FAA used an incorrect data analysis methodology.

**B.**

HAI also fails to support its objection that the Final Rule is arbitrary and capricious because the FAA reversed its longstanding policy of not altering air traffic patterns for the sole purpose of noise abatement.  HAI identifies no prior FAA policy that conflicts with the Final Rule while the FAA identified three instances where it promulgated rules altering air traffic patterns for the purpose of reducing noise over particular sites, *see Final Rule*, 77 Fed. Reg. at 39,917 & n.11 (citing 62 Fed. Reg. 1192 (Jan. 8, 1997) (Rocky Mountain National Park); 35 Fed. Reg. 5466 (Apr. 2, 1970) (President Washington's home at Mount Vernon); 33 Fed. Reg. 11,748 (Aug. 20, 1968) (Oberlin Conservatory of Music)).  Additionally, a September 2004 FAA Advisory Circular set forth recommendations for pilot use of the navigable airspace for the purpose of reducing the impact of flights on "noise-sensitive areas," such as "residential" zones, citing 49 U.S.C. § 40103 for its authority to make policy of this type.  FAA Advisory Circular, *Visual Flight Rules (VFR) Flight Near Noise-Sensitive Areas*, AC No: 91-36D (Sept. 17, 2004).  Rather than reversing past policy, the FAA has acted in accordance with a longstanding, if infrequently used, interpretation of its authority under § 40103.

**C.**

The Regulatory Flexibility Act provides, in relevant part:

> When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, . . . the agency shall prepare a final regulatory flexibility analysis.

5 U.S.C. § 604(a). The analysis must include a description and estimate of the "number of small entities to which the rule will apply or an explanation of why no such estimate is available" and "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . ." *Id.* § 604(a)(4) & (6). If, however, the "head of the agency certifies that the rule will not . . . have a significant economic impact on a substantial number of small entities," then no final regulatory flexibility analysis need be published. *Id.* § 605(b). The FAA made that certification. NPRM, 75 Fed. Reg. at 29,473; *Final Rule*, 77 Fed. Reg. at 39,919–20. Our review is highly deferential, "particularly . . . with regard to an agency's predictive judgments about the likely economic effects of a rule," *Nat'l Telephone Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009).

The FAA found that the cost increase per flight was minimal and concluded it was likely to be passed on to customers. *See Final Rule*, 77 Fed. Reg. at 39,919. Given that the high cost of helicopter flights to eastern Long Island suggests paying customers place a significant premium on their time, the FAA reasoned that paying customers would not choose far slower modes of transportation because of relatively small price increases. *See id.* Since the operators would not need to purchase new equipment to retrofit their helicopters, the FAA determined that the Final Rule would impose minimal costs on regulated small entities and that a regulatory flexibility analysis was not required. *See id.* at 39,919–20.

HAI objects, first, that the Final Rule would require small commercial operators to purchase expensive avionics to comply with the FAA's safety recommendations for safe flight along the North Shore Route, and that the FAA did not take these costs into consideration when certifying that a regulatory flexibility analysis was not needed. The North Shore Route,

however, contemplates that pilots would be operating under visual flight rules. *Id.* at 39,912. The FAA concluded that operators would not be required to purchase any new equipment, *see id.*, because pilot deviations from the North Shore Helicopter Route are permitted when aircraft cannot be operated safely along the route with existing equipment, s*ee* 14 C.F.R. § 93.103(b); *Final Rule*, 77 Fed. Reg. at 39,912, 39,914. HAI presents no basis to doubt FAA's certification on this ground.

Second, HAI objects that the FAA used an incorrect fuel price in concluding that the economic impact of increased fuel costs associated with longer flight times would not be significant because the small commercial helicopter operators would be able to pass on the minimal extra cost to their customers. The FAA found that helicopter flights from New York City to the east end of Long Island cost between $3,500 and $9,500 per trip, and initially calculated that the increased cost per flight would be $150, using the estimated ten minute time increase per flight proposed by the Council as the basis for this figure. *See Final Rule*, 77 Fed. Reg. at 39,918–19.

The FAA now acknowledges that the correct fuel price yields a cost increase of as much as $354 per flight. *See* Resp't's Br. at 47–48. Although this is a larger increase than the original estimate, it is not significant in relation to the total cost of a helicopter flight, especially when compared with the cost of travel by rail or by car. The FAA's conclusion that the increase would be passed on to paying customers, based on the high value they place on their time, remains reasonable. Although a court can affirm agency action only on grounds provided by the agency, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943); *Lakeland Bus Lines, Inc. v. ICC*, 810 F.2d 280, 287 (D.C. Cir. 1987), this requirement gives way here "when there is not the slightest uncertainty as to the outcome of a

proceeding on remand," *Manin v. NTSB*, 627 F.3d 1239, 1243 n.1 (D.C. Cir. 2011) (internal alteration and quotation marks omitted).

HAI further objects that the FAA used an incorrect estimate of the number of small entities that would be affected by the Final Rule. The FAA estimated that 35 small entities would be affected based on the number of commercial helicopter operators who were members of the Council. *Final Rule*, 77 Fed. Reg. at 39,919. According to FAA counsel, the Council is the "large membership organization for . . . helicopter operators in this region," Oral Arg. Tr. at 29, and the Council presented to the FAA that it "currently represents over 94% of the helicopter operators and businesses supporting helicopters in the New York Tri-State area, the majority of whom will be impacted directly by the proposed rule," Comments of the Eastern Region Helicopter Council at 1 n.1 (June 25, 2010). The Council estimated over 100 small entities used the North Shore Route, *see id.* at 15–16, but then, as now, provided no evidence of how it arrived at that figure. An unsubstantiated estimate is insufficient to call the FAA's figure into question.

To the extent HAI contends that the FAA violated Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), and Department of Transportation Order 2100.5 (May 22, 1980), both of which require that the agency perform cost benefit analyses for each proposed regulation, neither creates private rights, nor is an agency's failure to comply with these orders subject to judicial review. *See Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993).

Accordingly, we deny HAI's petition for review.